Of course, the final case of the day is People v. Britton. Your Honor, I'm Assistant Defender Levi Harris on behalf of the appellant Reginald Britton. May it please the Court, Mr. Britton has briefed two issues, but in the interest of time and with your leave, I'll confine my argument today to the first issue unless you have specific questions. Mr. Britton was denied a fair trial when the State was allowed to introduce testimony from three other women, uncharged conduct in this case, that Reginald Britton had battered them, where those incidents did not resemble the acts alleged in this case and were therefore substantially more prejudicial than probative. Now, Mr. Britton was on trial for attempted murder, aggravated battery, and aggravated domestic battery against a single victim, Roxanna Fancher. Pursuant to statute, the trial court permitted over objection, evidence from three other women about four other incidents of domestic violence as propensity evidence against Mr. Britton. Now, we know that the statutory exception is to the general common law rule that we don't allow propensity evidence because there's a risk that defendants are going to be convicted just for being bad eggs. I don't think bad eggs is the legal term, but you understand what I'm saying. So as an exception to a general rule, this requires careful weighing of the prior instances against the current instance to see whether it fits into the exception. The more similar the prior instances are, the more probative they become. Well, he's done this series of acts before. It looks like he probably did it again. The less similar it is, the less probative it is, and then the more undue the prejudice is because there's going to be prejudice. The question is whether it's undue. Of course, it said that there shouldn't be a mini-trial within a trial to evaluate all these other separate prior instances of domestic violence. Well, that's exactly what happened here. We had these three other women come in and testify to a series of other instances of domestic violence, not charged here. They took up lots of transcript pages, lots of time before the jury, and the jury was invited to consider all of those. Particularly the one that involved an allegation that my client had sexually assaulted a woman as part of a domestic battery. That was a specter that was completely absent from this case. And, you know, besides the fact that, oh, you know, the jury's invited to find him guilty of domestic battery, he's already met enough. Now they're told he's a rapist, as well, by this one woman. What was dissimilar with the other three? Well, Your Honor, you have to look at them case by case, if you'll permit me to do that. I know it seems like these women, at least to me, it's hard to keep them straight, but I think that's by the State's design and trial to sort of mush them all together. That, well, there was some drinking in this one or whatever. But in this case, against Roxanna Fancher, the defendant, my client, was dating a woman. They were out drinking, so there was drunkenness. They drive to a bar. They find out that this victim's friend is not there. My client is allegedly getting angry, calls the victim a bitch, punches her in the head. This has never happened before. She has memory loss, and she went to adoption. Okay. You're saying that this has never happened before with this victim or with any of the other three victims? Correct. She's never been struck before by my client, according to her. This particular victim. Correct. Okay. Okay, so in the previous incident testified to by Corey Andrew, there was no drinking. There was no current relationship. There was no driving anywhere. There was no exportation or confinement, as there was in this case alleged. This happened at the third party's house, not someplace where just the victim and my client were. It included the third party victim, boyfriend of the woman who testified. There was provocation beforehand, whereas in this case the victim said, no, there wasn't any provocation. It just sort of came out of nowhere. They got punched in the head. In that case, there was stalking. I mean, he just showed up at this other house, supposedly, and popped into the living room and started hitting this woman and the man she was out with. There was no relationship between him and the woman? There was no direct relationship. But there had been one? There had been a relationship in the past. So that was in September 2012, and I don't know when the relationship supposedly ended, but I know they were dating in 2010. So I don't know exactly when the relationship was alleged to have been. Didn't Judge Paisley's orders say that they were all approximate in time, within two years? Yes, Your Honor, and I think that that is correct, and that's not something that we can test. Isn't that one of the factors? That is one of the factors, and that's not something that we're quibbling about. The proximity in time, you know, we don't have any argument with that. It is a little confusing. One of the women said, well, I've been dating this guy for five years, and this other woman testified as well. He was living with me at the time, and it wasn't five years in the past. So I don't know what all was going on, whose memory was correct and so forth, but there was a lot going on. Did I answer your question as to whether they were dissimilar? I got to one prior to this one. You got to one. My understanding, my reading, was that all of the attacks were similar in so much as he battered them, head and face, and that he had relationships with those other women of some sort. I think that it's correct that there were either current or prior relationships. I don't think you would even be talking about the domestic violence statute if there weren't some type of relationship. Wasn't there also choking involved with the other incidents? There was choking, it looks like, in two of the prior incidents. There was no choking in this case. There was just a punch in the head and, you know, out cold supposedly, or maybe not out cold. I don't know if she was actually unconscious. She doesn't remember anything until she was found the next morning. So that's another instance. I think you meant for it to be a similarity, but I would say it's a difference. No, I was meaning they were similar in that the other incidents mostly involved choking. Were all three choking or one of them? Two of the three prior incidents were choking. Were all three hitting about the face? Hitting about the face or throat grabbing, yes, I would say. Let's talk for a moment about the one with the forced sex allegation because I think that's actually the one that is the most prejudicial and probably also the most different. In that one, there was no driving anywhere while this fighting was going on. There was no ascertation or confinement. In fact, I think my client was living with the alleged victim. There was an antecedent squabble allegedly over the victim's infidelity or suspected infidelity. This took place inside a house. There was throat grabbing, as you pointed out. But then there's a specter that the witness went back and forth. She said in grand jury testimony that no sex took place or that sex did take place. Then she says at her hearing testimony when they're evaluating whether to let these priors in that no sex took place and she's confronted with it. So she goes back and forth several times about whether this forced sex actually took place or not. But I'm not going to quote the language that he purportedly used, but this idea that he, as part of this beating act, would bring this woman over and force her to perform oral sex while he's supposedly drunk and throwing up in the toilet. But just the whole thing is so far different than what we had in our case, which is what the jury is supposed to be thinking about, just a single punch in the head and wakes up in a dog kennel. But also just raises this terrible specter of rape that was not charged in this case. There was no finding of any kind of sexual assault. There was no testimony from the witness that he'd ever sexually assaulted her or had sexually assaulted her. So once, I mean, you can't even say rape, I think, before juries if you're talking to a sexual assault case, to throw out whether the defendant is a rapist. And I'm not saying that the prosecutor said that here, but that specter, once that's in a jury's mind, I don't know how you can go back there or expect a jury to go back there and say, okay, there's prior instances where he hit women about the head and face and not be thinking, oh, my gosh, he forced that poor woman to perform oral sex or, you know, oh, my gosh, he stalked this other woman and choked her and threatened to kill her. Other things that didn't happen in this case to where you're just thinking, my God, this is a bad guy. We've got to do something. Let's get him off the street. And I think that's exactly what the state invited the jury to do by saying, look, we know what this guy does. He cheats and he beats. Now, I say, and I don't suppose it matters that much, but there's no application or indication in the record that my client was cheating on these women at all. I'm not saying that that makes him a model citizen in any way. But, you know, the state just lumped all this stuff together and invited the jury just to sort of write him off. Cheater, beater. Several times they say that phrase. So I think the state invited. Can you finish your sentence? The state invited the jury to do exactly what we're afraid the jury did and what the law prohibits. I'll be counsel. I'll have an opportunity for a vote. I have the lead. May it please the court. Counsel. My name is Sharon Shanhan and I represent the people of the state of Illinois. I have just one very quick thing that I'd like to say about issue two. In his reply brief, counsel for the defendant says that the state carelessly cited Eubanks, claiming that Eubanks dealt with prior inconsistent statements, whereas the issue here is prior consistent statements. Here's a direct quote from Eubanks. However, even if the trial court did consider the prior consistent statements, such error was harmless. Porter testified before the grand jury and at trial that Ellie was crying and screaming in the middle of the night. Thus, Forty's prior consistent statements were merely cumulative of other powerfully admitted testimony. So the argument the state was making at that point was that this was cumulative. If it was error, it was cumulative error. Eubanks does stand to that. Eubanks is not dealing with prior inconsistent statements. Moving on to issue, back to issue one, I guess I would say. I think it's important to remember here that this is a case dealing with plain air. Now, counsel for the defendant says the distinction between plain air and harmless air is a tempest in a teapot, but I disagree. What we're looking at here is the discretion that this trial court used in, after hearing the testimony of these three women, in deciding if they would be allowed to testify and how much they would be able to testify. Now, the defendant claims a level of specificity and similarity in these other women that is not required by our Supreme Court. In People v. Donahoe, interpreting a very similar statute, the sexual assault statute, the defendant claimed that in the first case there was no relationship with the children, whereas in the second case he was their stepfather in the prior, I mean the other witnesses, no relationship with the children. In this case, he was their stepfather. And there was a single incident. There were multiple incidents. The last time was a boy and a girl at the same time. This is this time that he's a child separately. The last time that he said he played a game with them, and this time he threatened them. Those are far greater distinctions than arise in this case, and yet the Supreme Court said these differences are not significant, that what was more compelling was the similarities. In People v. Dads, the Supreme Court interpreting this statute said general similarity is all that's required and went on to note no two independent crimes are identical. Now here, all of the women, the three women that testified as prior acts of domestic violence, they were all three defendants' girlfriends, prior, previous girlfriends. Now the defendant says that there will always be a domestic relationship under this statute. That's true, but that doesn't mean that there will always be girlfriends. This statute covers a lot of people. For example, if the defendant had hit his uncle or a male roommate, then I think that would probably not be probative of hitting girlfriends. But in this case, they were all previous girlfriends. Justice Moore, as you pointed out, and Justice Barbarossa, I believe you did too, that these crimes all occurred by striking these women on or about their face, neck. So again, very similar. It wasn't like, well, he shot that one and he beat up them, beat them up around the face this time. There was provocation in all of these cases. And in the instant case, we know that Ms. Fansher testified that the defendant was angry because he didn't believe that Ms. Fansher's friend Melanie had called and said she needed help. We also see in the video of the defendant that they went into the Cove Bar and the defendant was seen arguing immediately. They just were in there a few minutes because the defendant was almost immediately arguing. Do you know the age of Roxanna? Not off the top of my head. That's how I saw it. Okay. But basically, and going back to when the defendant was angry because he didn't believe that Ms. Fansher's friend had called, he accused Ms. Fansher of being a lying bitch. Now, it is correct that there's a lot we don't know about what happened here because Ms. Fansher was unconscious. We don't know, quite honestly, whether she was confined in that dog kennel. She was certainly there. She was seen there, but she was also seen moments later climbing out of it. So I don't think that we can say that that's a required similarity that needs to exist with these other women. And we don't know whether he – I mean, her face was badly beaten when she was first discovered, swollen. Her lips were swollen. Her eyes were swollen. The people that found her said that her face was just a mess. So we don't know whether she was hit one time. She was hit other times. I think it's important to note, too, that the trial court exercised a great deal of discretion here. Ms. Andre testified to more than half a dozen examples of domestic violence against her. He only let her testify to two. Moreover, he didn't let anybody testify until and unless Ms. Fansher testified consistently with her grand jury testimony. Now, going back to this tempest at a teapot, as I said, this issue was not preserved. It is harmless error. And this is where this distinction comes about, is that it is the defendant's burden in plain error to prove prejudice, whereas in harmless error it would be up to the state to prove that there was no prejudice. This is simple domestic battery. Ms. Fansher testified that the defendant hit her on the head as she tried to retrieve her phone. An excited utterance was admitted into evidence when she told Mr. Eckenrode that her boyfriend was the one that hit her. Again, she was cold. Her lips were badly swollen, and I believe she had a speech impediment in addition to that, but I never could decide 100 percent on that. But after she said her boyfriend hit her, Mr. Eckenrode asked her what his name was. Now, stop and think about trying to say Reggie when your lips are cold, swollen, and you're really cold, and maybe you've got a speech impediment on top of that. I tried saying it, I know. I think it's pretty easy to say you can say Reggie. I mean, I think that's kind of what it's going to come out like. So he says, are you saying Rick Reed? She said no. I mean, she shook her head no. Are you saying Ron Reed? No. Are you saying Reggie? Yes. She was responding very clearly in the only way that she could. Now, defendant says that Rick Reed is ICE, and I think that Rebecca is less than clear on that issue. She said that she was asked, do you know Rick Reed by a different name? And she said, if you know his nickname, I might. If he goes by ICE, then yeah. But that's it. That's where it stops. There's nothing that says, yes, that's the nickname he goes by. So it's not at all clear that ICE is Rick Reed. But in any case, she said no, Rick Reed did not hit me. And finally, defendant's phone was found at the location of the assault. A hat that was probably worn by the defendant was found at the location of the assault. And defendant concedes that he has no objection to one of the two instances that Ms. Andre testified about. He concedes that it is factually similar. And there she testified that she and the defendant went to a bar, got in an argument, he hit her in the face, and they drove her home through the country. If he was there, it certainly was not planned. Thank you, counsel. Your Honor, just briefly I'll address a few of the things that counsel for the state said. Right towards the end, she said that there was this hat that was found at the scene that the defendant had probably worn. We addressed that in our briefs. We don't agree with that assessment that the defendant had probably worn it. There were three different DNAs on it. She didn't get it all the way out to all the different, I don't know what they are, alleles or chromosomes or whatever. But she said, I don't want you to say I'm making an identification. I didn't. We just can't exclude the defendant as one of the contributors on this hat. Counsel pointed out that there was this excited utterance and, you know, that there would have been, in other words, enough to convict this client if there had not been even all this other stuff of what he was convicted of, which was simple domestic battery. We're not up here to argue against that point. If we were, this would be a reasonable doubt argument where we would be saying the state didn't prove beyond a reasonable doubt. What we're saying is there was so much other crud that was admitted in this case against my client that the jury was never even able to zero in on the stuff that it should have been evaluating in weighing this case. You know, we talk about the head and the face, that there were punches in the head and the face or there was a choking in some of these cases. I don't know what level of similar. You're saying there was no choking. There was no choking in this case. Correct. But, you know, if the rule is going to be that, well, there was – he hit a girl before he hit a girl this time, I mean, we can say that's the rule and maybe that will become the rule. I don't think that currently is. But if that's not the rule, then I think we have to do more than just say, well, there was hitting about the head and face in the past and there was hitting about the head and face here with this girlfriend. As far as the tempest and the teapot, I think that the equivalent is between whether we're talking about harmless error or whether we're talking about plain error. And, you know, understand it's the defendant's burden to prove prejudice in this case because this was not fully preserved. It was litigated in a motion in limine. Counsel did not preserve it in this post-trial motion. So we're not trying to wiggle out of our burden on prejudice. What we're saying is that there was prejudice demonstrated because the evidence in this case was closely balanced. You know, you have one witness really, the victim, who couldn't remember what happened right before this attack allegedly occurred. She said, no, we never went into the bar. You have videotape of her going into the bar because there's some kind of conversation with this other guy that she doesn't even remember. She doesn't remember what happened for seven, eight, ten hours after this supposed attack. But supposedly she's crystal clear about this one incident where she was punched in the head. We just don't believe that that's overwhelming evidence of guilt. I do have one other question for you with regard to the allowing in the sexual assault reference. He, the jury, had the option of finding him guilty of aggravated domestic violence. Correct. And didn't. Correct. Despite hearing that type of heinous testimony, they gave him the lesser included of simple battery. Correct. Yes, Your Honor. So how is there prejudice? Well, what we would say is it cuts. Potentially charge him with something of that nature even without the. You would think that that type of testimony would cause him to go higher rather than lower with their conviction. Well, Your Honor, I think that it cuts both ways. I think we talked about this. The fact that the jury looked at this and only found him guilty of this lesser included offense is evidence that there wasn't overwhelming evidence showing his guilt. So that, you know, the less overwhelming the evidence is, I would think the more important the errors are. So that in this case, if the jury had not heard that stuff, maybe they thought, you know what, I don't really think he did anything. We better do something. We can't let this guy off scot free. Maybe they wouldn't have convicted him at all if they hadn't heard that. Obviously, you know, we're not here talking about the attempted murder charge or the aggravated battery because the state dropped those because I think even it recognized that there was no evidence to support those claims. Anyway, Your Honor, I don't want to just keep up here yammering. If you have any questions, I'm happy to answer them. But no questions. Thank you, Counselor. The court will take the matter under indictment and issue a decision in due course. The court stands in recess for the day. Thank you.